**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JORDAN WILSON, derivatively on behalf of DATAVAULT AI INC.,<br><br>Plaintiff,<br><br>v.<br><br>BRETT MOYER, NATHANIEL T. BRADLEY, KIMBERLY BRISKEY, JEFFREY M. GILBERT, DAVID HOWITT, HELGE KRISTENSEN, STANLEY MBUGUA, SRIRAM PERUVEMBA, ROBERT TOBIAS, GARY WILLIAMS and WENDY WILSON<br><br>Defendants,<br><br>and<br><br>DATAVAULT AI INC.,<br><br>Nominal Defendant. | CASE NO.<br><br>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Jordan Wilson ("Plaintiff"), by and through his attorneys, hereby submits this Shareholder Derivative Complaint (the "Complaint") for the benefit of Nominal Defendant Datavault AI Inc.[1], against certain current and former members of its Board of Directors (the "Board") and executive officers seeking to remedy Defendants' breaches of fiduciary duties and unjust enrichment from September 4, 2024 through the present (the "Relevant Period"). Plaintiff makes these allegations upon personal knowledge and the investigation of counsel, which

[1] As discussed herein, Datavault underwent several name changes prior to and during the time period at issue. For clarity and convenience, the company primarily is referred to herein as "Datavault" or "Company" unless a previous name is material to the allegation.

included, among other things, review and analysis of: a) public filings made by Datavault and other related parties and non-parties with the Securities and Exchange Commission ("SEC"); b) press releases and other publications disseminated by certain of the Defendants and other non-parties; c) news articles, shareholder communications and postings on Datavault's website; d) publicly available filings in a related securities class action lawsuit captioned *Aramouni v. Datavault AI Inc. et al.*, No. 2:26-cv-05548-JS, in the U.S. District Court for the Eastern District of Pennsylvania (the "Securities Action"); and e) other publicly available information concerning Datavault and the Individual Defendants (defined below under "Parties.") Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. Datavault is a technology licensing company that owns a portfolio of platforms that, according to its SEC filings, are "designed to redefine how data is managed, valued, and monetized in the modern era." The Company purports to leverage proprietary high-performance computing capabilities and advanced software "to ensure data ownership immutability, experiential data observability, precise data asset valuation, and secure monetization—which we believe will unlock significant opportunities for businesses in an increasingly data-driven world."

2. In February 2025, Datavault's predecessor, WiSA Technologies, Inc. ("WiSA"), competed its $210 million acquisition of Data Vault Holdings, Inc. ("DVH") and its Datavault Platform, from EOS Technologies, Inc. ("EOS"), which was and is owned by the Company's CEO. According to the Company, the Datavault Platform "creates value through scarcity, utility, and encrypted data protection and generates revenue through licensing partnerships . . ." With this acquisition, WiSA renamed itself Datavault AI Inc.

3. Over the months that followed, Datavault announced corporate partnerships with Burke Products ("Burke"), Scilex Holding Company ("Scilex") and Nature's Miracle Holding Inc. (Nature's Miracle"), each of which the Company claimed would create "technologies synergies" and generate millions of dollars in revenue by leveraging the acquired companies' existing technology and customer bases.

4. Datavault also touted its strong executive management, assuring the market that its "corporate governance and quality in our management. . ." would "drive revenue . . .[and] meet these expanded goals." The Company also represented that its executive compensation policies and procedures were "centered on a pay-for-performance philosophy" and "strongly aligned with the long-term interests of our stockholders."

5. Unfortunately for investors, the Company's stated lofty goals and ambitious claims were unreachable and their related representations untrue. Beginning in September 2024, Datavault issued a series of statements that were materially false and misleading when made in that they: (a) overstated the economic value of the Company's highly touted acquisitions and corporate partnerships; (b) exaggerated the volume of trading activity on Company platforms; (c) concealed Datavault's fundamental affiliations with individuals known to defraud investors; and (d) misrepresented the alignment of the Company's executive compensation with shareholder value.

6. These misrepresentations were exposed on October 31, 2025, when Wolfgang Research issued a report titled "DVLT: A Joke Brought to You by a Promotor Sanctioned by the SEC who has Co-Authored Patents with a Convicted Felon Charged in an Elaborate Pump-and-Dump" ("Wolfgang Report"). According to the Wolfgang Report, the Company was little more than a "stock promotion" firm that hinged on "empty claims" concerning its artificial intelligence,

quantum computing, Web 3.0 and data monetization capabilities being led by a Chief Executive Officer who, in 2021, paid $40,000 and agreed not to serve as a public company officer director for three years to settle claims brough by the SEC for issuing misleading statements concerning COVID-19 information to investors. Moreover, the Wolfgang Report revealed that Datavault's "blockchain-powered AI platform" consisted of meaningless non-fungible tokens ("NFTs"). Its 22,000 square foot fully operational workspace was a small office with one employee; Nathaniel T. Bradley ("Bradley") purportedly operated as CEO from a New Jersey beauty salon; and that a co-inventor and patent holder of the Company's most important patents was an individual convicted of conducting a pump-and-dump scheme that defrauded investors, among other things.

7. Investors also learned that Datavault's statements misrepresented the Individual Defendants' oversight of the Company and the alignment of their compensation with shareholder value, particularly in light of the fact that the Company's CEO, Board Chairman and Chief Accounting Officer sold material portions of their respective Datavault stock holdings in a manner that was, at a minimum, suspicious in timing and amount, raking in nearly $74 million while Datavault struggled to survive. Moreover, the Company's heavily touted acquisition of DVH was, in reality, a reverse merger that public investors did not approve and that resulted in a $210 million windfall to a company owned and controlled by Datavault's CEO.

8. When this news reached the market, the price of Datavault common stock immediately dropped nearly 20%, or $.49 per share on October 31, 2025.

9. As alleged below, throughout the Relevant Period, the Individual Defendants endorsed or otherwise allowed Datavault to issue the above-referenced false and/or misleading statements in violation of their fiduciary duties. As a result, the Company has suffered significant financial and reputational damages.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

11. This Court has jurisdiction over each Defendant because they reside in this district or have sufficient minimum contacts with this district to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. The Court has personal jurisdiction over the Nominal Defendant because it is authorized to do business in this state, has consented to service in this state and its principal place of business is within this district.

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because one or more of the Defendants either resides in or maintains offices in this district, a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to the Company occurred in this district, and Individual Defendants have received substantial compensation in this district by doing business here and engaging in numerous activities that had an effect in this district.

## PARTIES

13. Plaintiff is a current shareholder of Datavault and has continuously held Datavault common stock since July 2024. Plaintiff is a citizen of Montana.

14. Nominal Defendant Datavault is a Delaware corporation with its principal offices located in Philadelphia, PA. The Company was called Summit Semiconductors, Inc. from December 2017 to March 2022 and, from March 2022 to February 2025, called WiSA Technologies, Inc. before renaming itself Datavault AI Inc. in conjunction with its acquisition of

the assets of Data Vault Holdings, Inc. ("Data Vault Holdings"). Datavault's common stock trades on the NASDAQ Exchange under the ticker symbol "DVLT."

15. Defendant Brett Moyer ("Moyer") has served as Board Chairman since 2025. Moyer co-founded WiSA and served as its President and Chief Executive Officer ("CEO") from August 2010 to December 2024. Upon information and belief, Moyer is a resident of California.

16. Defendant Nathaniel Bradley ("Bradley") has served as CEO and a director of Datavault since 2024, prior to which Bradley founded Data Vault Holdings and served as its CEO. Upon information and belief, Bradley is a resident of New Jersey.

17. Defendant Kimberly Briskey ("Briskey") has served as a Datavault director since June 2024. Briskey is Chairwoman of the Board's Audit Committee. Upon information and belief, Briskey is a resident of Florida.

18. Defendant Jeffrey Gilbert ("Gilbert") has served as a director of the Company and its predecessor since 2014. Gilbert is a member of the Board's Compensation Committee and Nominating and Corporate Governance ("NCG") Committee. Upon information and belief, Gilbert is a resident of California.

19. Defendant David Howitt ("Howitt") has served as a director of Datavault and its predecessor since 2021. Upon information and belief, Howitt is a resident of Oregon.

20. Defendant Helge Kristensen ("Kristensen") has served as a director of the Company and its predecessor since 2010. Upon information and belief, Kristensen is a resident of California.

21. Defendant Stanley Mbugua (Mbugua") has served as Datavault's Chief Accounting Officer and Vice President of Finance since 2024. Upon information and belief, Mbugua is a resident of California.

22. Defendant Sriram Peruvemba ("Peruvemba") has served as a director of Datavault and its predecessor since 2020. Peruvemba is Chairman of the Board's Compensation Committee and a member of its Audit Committee. Upon information and belief, Peruvemba is a resident of California.

23. Defendant Robert Tobias ("Tobias") has served as a director of the Company and its predecessor since 2020. Tobias is Chairman of the Board's NCG Committee and a member of its Compensation Committee. Upon information and belief, Tobias is a resident of Oregon.

24. Defendant Gary Williams ("Williams") served as Datavault's Chief Accounting Officer and Vice President of Finance from 2019 until 2024. Upon information and belief, Williams is a resident of California.

25. Defendant Wendy Wilson ("Wilson") has served as a director of Datavault and its predecessor since 2021. Wilson is a member of the Board's Audit Committee. Upon information and belief, Wilson is a resident of California.

26. Defendants Moyer, Bradley, Briskey, Gilbert, Howitt, Kristensen, Mbugua Peruvemba, Tobias, Williams and Wilson are referred to herein as the "Individual Defendants."

27. Defendants Moyer, Bradley, Briskey, Gilbert, Howitt, Kristensen, Peruvemba, Tobias and Wilson are referred to herein as the "Director Defendants."

28. Defendants Briskey, Peruvemba and Wilson are referred to herein as the "Audit Committee Defendants."

29. Defendants Peruvemba, Gilbert and Tobias are referred to herein as the "Compensation Committee Defendants."

30. Defendants Gilbert and Tobias are referred to herein as the "NCG Committee Defendants."

**INDIVIDUAL DEFENDANTS' DUTIES**

31. By reason of their positions as officers, directors, and/or fiduciaries of Datavault, and because of their ability to control the business and corporate affairs of the Company, Individual Defendants owed Datavault and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner.

32. Further, Individual Defendants were and are required to act in furtherance of the best interests of Datavault and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest and benefit. Each director and officer of the Company owes to Datavault and its shareholders the fiduciary duty to exercise good faith and due diligence in the administration of the Company's affairs, and in the use and preservation of its property and assets, as well as the highest obligation of fair dealing.

33. Because of their positions of control and authority as directors and/or officers of Datavault, having knowledge of material non-public information regarding the Company, the Individual Defendants were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties the Individual Defendants were required to, among other things:

a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner, and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public; and

c. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

34. Additionally, the majority of the Director Defendants had, at all relevant times, additional duties to the Company's shareholders by virtue of their memberships on Board committees. Datavault's Audit Committee Charter states, in relevant part:

> PURPOSE
>
> The primary purpose of the Audit Committee (the "Committee") of the board of directors (the "Board") of [Datavault] (the "Company") ***shall be to oversee the Company's accounting and financial reporting processes and the audit of the Company's financial statements with respect to (i) the Company's corporate accounting and financial reporting processes, systems of internal control over financial reporting and audits of financial statements, systems of disclosure controls and procedures, as well as the quality and integrity of the Company's financial statements and reports***,[2] (ii) the qualifications, independence and performance of the registered public accounting firm or firms engaged by the Company (the "Auditors"), (iii) review of any reports or other disclosure required by the applicable rules and regulations of the U.S. Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement and periodic reports within the scope of authority outlined herein and (iv) the performance of the Company's internal audit function, if any. The Committee may also provide oversight assistance in connection with the Company's legal, regulatory and ethical compliance programs as established by management and the Board.

* * *

[2] All emphasis added.

AUTHORITY, DUTIES AND RESPONSIBILITIES

Each Member ***shall have full access to all books, records, facilities and personnel of the Company*** as deemed necessary or appropriate by any Member to discharge his or her responsibilities hereunder.

* * *

11. Audited Financial Statement Review; Annual Report on Form 10-K. To ***review with management and the Auditors, as appropriate, upon completion of the audit, (i) the Company's financial statements and any disclosure from the Company's Chief Executive Officer and Chief Financial Officer*** to be made in connection with the certification of the Company's Annual Report on Form 10-K to be filed with the SEC, prior to public disclosure of such financial information, if practicable, and/or filing with the SEC of the Company's Annual Report on Form 10-K, and to recommend whether or not such financial statements should be so included and (ii) other relevant reports or financial information submitted by the Company to any governmental body or the public, including relevant reports rendered by the Auditors (or summaries thereof).

12. Quarterly Results and Reports on Form 10-Q. To ***review with management and the Auditors, as appropriate, (i) the results of the Auditors' review of the Company's quarterly financial statements and any disclosure from the Company's Chief Executive Officer and Chief Financial Officer*** to be made in connection with the certification of the Company's quarterly reports filed with the SEC, prior to public disclosure of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Report on Form 10-Q, and any other matters required to be communicated to the Committee by the Auditors under the standards of the PCAOB and (ii) other relevant reports or financial information submitted by the Company to any governmental body or the public, including relevant reports rendered by the Auditors (or summaries thereof).

* * *

14. Press Releases. To ***review with management and the Auditors, to the extent appropriate, earnings press releases, as well as the substance of financial information and earnings guidance provided to analysts*** and ratings agencies (including, without limitation, reviewing any pro forma or non-GAAP information), which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made.

* * *

16. Risk Assessment and Management. To ***review and discuss with (i) management and the Auditors, as appropriate, the Company's guidelines and policies with respect to financial risk management and financial risk assessment,***

***including the Company's major financial risk exposures*** and the steps taken by management to monitor and control these exposures and (ii) management risks relating to data privacy, technology and information security, including cyber security, and back-up of information systems and the steps the Company has taken to monitor and control such exposures.

* * *

22. Internal Control over Financial Reporting; Disclosure Controls. To (i) ***confer with management and the Auditors, as appropriate, regarding the scope, adequacy, and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures, including any significant deficiencies, significant changes in internal controls and the adequacy and effectiveness of the Company's information and cyber security policies and the internal controls regarding information security***, (ii) confer with management and the Auditors, as appropriate, regarding the responsibilities, budget and staff of the internal audit function (if any) and review of the appointment or replacement of the senior internal audit executive or manager and (iii) obtain reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies.

* * *

27. Ethical Compliance. To ***review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws and rules, as well as to its Code of Business Conduct and Ethics, including review and approval of related-party transactions***.

28. Investigations. To ***investigate any matter brought to the attention of the Committee*** within the scope of its duties if, in the judgment of the Committee, such investigation is necessary or appropriate.

29. Proxy Report. To ***oversee the preparation of the report of the Committee required by the rules of the SEC to be included in the Company's annual proxy statement***.

* * *

32. Report to Board. To ***report to the Board material issues that arise regarding the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements***, the performance or independence of the Auditors, the performance of the Company's internal audit function (as applicable) or such other matters as the Committee deems appropriate from time to time or whenever it shall be called upon to do so.

* * *

34. Other Legal and Finance Matters. To ***review, (i) with the Company's counsel, legal compliance and legal matters that could have a significant impact on the Company's financial statements, and (ii) with management, the Company's finance function, including its budget, organization and quality of personnel***…

35. Datavault's Compensation Committee Charter states, in relevant part:

PURPOSE

The primary purpose of the Compensation Committee (the "Committee") of the board of directors (the "Board") of [Datavault] (the "Company") ***shall be to act on behalf of the Board in fulfilling the Board's oversight responsibilities with respect to the Company's compensation policies, plans and programs, and to review and determine (or recommend to the Board for approval) the compensation to be paid to the Company's executive officers and directors. In addition, the Committee shall (i) review and discuss with management the Company's disclosures contained under the caption "Compensation Discussion and Analysis" ("CD&A"), when and as required by applicable rules and regulations of the U.S. Securities and Exchange Commission (the "SEC") in effect from time to time, for use in any of the Company's annual reports on Form 10-K, registration statements, proxy statements or information statements filed with the SEC and (ii) prepare and review the Committee report on executive compensation included in the Company's annual proxy statement in accordance with applicable rules and regulations of the SEC in effect from time to time.***

***The term "compensation" shall include salary, long-term incentives, bonuses, perquisites, equity incentives***, severance arrangements, retirement benefits and other related benefits and benefit plans.

* * *

AUTHORITY

Each member of the Committee ***shall have full access to all books, records, facilities and personnel of the Company*** as deemed necessary or appropriate by any member of the Committee to discharge his or her responsibilities hereunder, including human resources personnel preparing the Compensation Discussion and Analysis for inclusion in the Company's filings with the SEC when and as required.

* * *

RESPONSIBILITIES

* * *

1. Overall Compensation Strategy. The Committee ***shall review, modify (as needed) and approve, or review and recommend, as applicable, the overall compensation strategy and policies for the Company, including:***

> • reviewing and approving, or reviewing and recommending to the Board for approval, ***annual corporate goals and objectives relevant to the compensation of the Chief Executive Officer of the Company (the "CEO") and, to the extent applicable, other executive officers*** and senior management of the Company, as appropriate;
>
> • evaluating and approving, or recommending to the Board for approval, the ***Company's performance against corporate goals and objectives***;
>
> • evaluating and approving, or recommending to the Board for approval, the ***compensation plans and programs advisable for the Company***, as well as evaluating and approving, or recommending to the Board for approval, the ***modification or termination of existing plans and programs***;
>
> • establishing ***policies with respect to equity compensation arrangements with the objective of appropriately balancing the perceived value of equity compensation and the dilutive and other costs of that compensation to the Company***;
>
> * * *
>
> • evaluating the ***efficacy of the Company's compensation policy and strategy in achieving expected benefits to the Company*** and otherwise furthering the Committee's policies.

2. Compensation of Chief Executive Officer. The Committee ***shall determine and approve, or review and recommend to the Board for approval, the compensation and other terms of employment of the CEO and shall evaluate the CEO's performance in light of relevant corporate goals and objectives, taking into account, among other things, the policies of the Committee and the CEO's performance in:***

> • ***fostering a corporate culture that promotes the highest level of innovation, integrity and the highest ethical standards***;
>
> • ***developing and executing the Company's long-term strategic plan*** and conducting the business of the Company in a manner ***appropriate to enhance long-term stockholder value***;
>
> • achieving the ***corporate goals and objectives*** . . .

* * *

4. Compensation of Directors. The Committee shall annually ***review and recommend to the Board the type and amount of compensation to be paid or awarded to non-employee Board members***, including any consulting, retainer, meeting, committee and committee chair fees, as well as equity awards. . .

36. Datavault's NCG Committee Charter states:

PURPOSE

The primary purpose of the Nominating and Corporate Governance Committee (the "Committee") of the board of directors (the "Board") of Summit Wireless Technologies, Inc. (the "Company") ***shall be to: (i) oversee aspects of the Company's corporate governance functions on behalf of the Board; (ii) make recommendations to the Board regarding corporate governance issues; (iii) identify and evaluate candidates to serve as directors of the Company***, consistent with the criteria approved by the Board, and review and evaluate the performance of the Board; (iv) serve as a focal point for communication between director candidates, non-committee directors and the Company's management; (v) recommend to the Board for selection candidates to the Board to serve as nominees for director for the annual meeting of stockholders; and (vi) make other recommendations to the Board regarding affairs relating to the directors of the Company.

* * *

RESPONSIBILITIES

* * *

1. Director Nominations. The Committee ***shall identify and evaluate candidates to serve on the Board consistent with the criteria approved by the Board, including consideration of the potential conflicts of interest as well as applicable independence and other requirements. The Committee shall also have responsibility for reviewing, evaluating and considering the recommendation for nomination of incumbent directors for re-election*** to the Board, as well as monitoring the size of the Board. The Committee shall also recommend to the Board for selection, candidates to the Board to serve as nominees for director for the annual meeting of stockholders. The Committee shall also have the power and authority to consider recommendations for Board nominees and proposals submitted by the Company's stockholders, to recommend to the Board 2 Summit Wireless Nominating and Corporate Governance Committee Charter 1-30-2018 appropriate action on any such proposal or recommendation and to make any disclosures required by applicable law in the course of exercising its authority. The Committee shall recommend nominees to the Board at an appropriate time: (a) prior

to each annual meeting of stockholders at which directors are to be elected or re-elected; and (b) after a vacancy arises on the Board or a director advises the Board of his or her intention to resign.

* * *

3. Board Assessment. The Committee ***shall periodically review, discuss and assess the performance of the Board, including Board committees, seeking input from senior management, the full Board and others. The assessment shall include evaluation of the Board's contribution as a whole and effectiveness in serving the best interests of the Company and its stockholders***, specific areas in which the Board and/or management believe contributions could be improved, and overall Board composition and makeup. The factors to be considered shall include whether the directors, both individually and collectively, can and do provide the integrity, experience, judgment, commitment, skills and expertise appropriate for the Company. The Committee shall also consider and assess the independence of directors, including whether a majority of the Board continue to be independent from management in both fact and appearance, as well as within the meaning prescribed by any stock exchange on which any of the Company's capital stock is then listed. The results of these reviews shall be provided to the Board for further discussion as appropriate.

* * *

8. Ethical Compliance. The Committee ***shall review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws and rules, as well as to the Code of Conduct***.

9. Insider Trading Policy and Risk Assessment. The Committee ***shall review, and recommend that the Board consider and approve, any changes to the Company's Insider Trading Policy. The Committee shall also oversee and review with management the Company's major legal compliance risk exposures and the steps management has taken to monitor or mitigate such exposures, including the Company's procedures and any related policies with respect to risk assessment and risk management***.

10. Related-Party Transactions. The Committee ***shall review and approve or disapprove all related-party transactions (defined as those transactions required to be disclosed under Item 404 of Regulation S-K of the Securities Act of 1933, as amended (the "Securities Act")) on an ongoing basis***. . .

## SUBSTANTIVE ALLEGATIONS

### *A. Background*

37. According to Datavault's Annual Report for 2025 filed March 18, 2026 with SEC on Form 10-K, the Company is:

> a pioneering technology licensing company that owns a portfolio of patented, secure platforms designed to redefine how data is managed, valued, and monetized in the modern era. Leveraging our proprietary high-performance computing ("HPC") capabilities and advanced software, our technology offerings are designed to ensure data ownership immutability, experiential data observability, precise data asset valuation, and secure monetization—which we believe will unlock significant opportunities for businesses in an increasingly data-driven world. Datavault has two synergistic platforms—Data Sciences and Acoustic Sciences—that our executive leadership is focusing on as key drivers of future revenue growth.
>
> Our Data Sciences division is focused on the delivery of cyber-secure, privacy protected data management and monetization technologies, the heart of which are our offerings of artificial intelligence ("AI")-driven agents—branded as Data Vault®, DataValue®, DataScore®, and Data Vault Bank®. We believe our Data Sciences division will redefine data management by providing a software as a service ("SaaS") platform designed to enable organizations to acquire, value, refine, and monetize their data assets with unparalleled security and control. Our Acoustic Sciences division is focused on technological innovations that have already produced advanced technologies in data-over-sound, low latency spatial audio and high-definition ("HD") audio transmission, and our patented semiconductor and digital module technologies are currently being deployed by several key customers, including Bang & Olufsen, Harmon Kardon, Klipsch and other leading electronics manufacturers.

38. On July 26, 2018, Datavault—then called Summit Semiconductor Inc.—completed its initial public offering through which it raised gross proceeds of $12 million. According to a July 27, 2018 press release, the Company would operate as a technology company that "delivers the wireless immersive sound experience with patented technology supporting the WiSA™ (Wireless Speaker and Audio) interoperability standard . . ."

39. On September 17, 2018, Summit Semiconductor Inc. changed its name to Summit Wireless Technologies Inc. "to better reflect its position as a leading provider of immersive, wireless sound technology for intelligent devices and next-generation home entertainment systems," according to an industry publication.

40. On March 11, 2022, the Company announced that it had changed its name to WiSA Technologies, Inc., "a developer of spatial, wireless sound technology for smart devices and next-generation home entertainment systems . . ."

***B. Defendants' False and Misleading Statements***

41. On September 4, 2024, the Company issued a press release titled "WiSA Technologies Executes $210 Million Definitive Agreement to Purchase Assets, Including High-Performance Computing (HPC) Software and Acoustic Technologies IP, from Data Vault Holdings Inc" ("9/4/24 Release"), which stated the following concerning the transaction:

> WiSA Technologies, Inc. ("WiSA Technologies") (NASDAQ: WISA), announced that it has executed a definitive asset purchase agreement (the "Asset Purchase Agreement") to purchase the Datavault® intellectual property and information technology assets of privately held Data Vault Holdings Inc.® for $210 million, consisting of 40 million shares of common stock of WiSA Technologies to be issued at $5 per share plus a $10 million 3-year Note. . .
>
> The resulting publicly traded data technology and licensing company will ***enable clients and strategic partners to monetize their Blockchain Data and AI Web 3.0 assets via tokenization, data ownership and digital twins***. Following the asset acquisition, the company will include the Datavault and ADIO assets, talent and experience with WiSA Technologies to offer two solutions.
>
> ***Data Sciences will license High Performance Computing (HPC) software applications and Web 3.0 data management*** serving biotech research, energy, education, fintech, real estate, healthcare, among others. . .

42. The 9/4/24 Release further discussed the acquisition and touted the Company's technology and management as follows:

> About the Datavault Platform
>
> Datavault's software and encryption enables a ***comprehensive solution for managing and monetizing data in the Web 3.0 environment***. It allows risk-free licensing of name, image, and likeness (NIL) by securely attaching physical real-world objects to immutable metadata or blockchain objects, fostering responsible AI with integrity. Datavault's solutions ensure privacy and credential protection. They are completely customizable and offer AI and ML automation, third-party

integration, detailed analytics and data, marketing automation and advertising monitoring.

***The platform creates value*** through scarcity, utility, and encrypted data protection and ***generates revenue through licensing partnerships*** that provide detailed analytics, sophisticated HPC modeling, digital ownership, tokenization, and advertising, among other means.

*   *   *

Upon closing, Bradley will become CEO and Moyer CFO and the company intends to change its name to Datavault Inc.

About Nathaniel (Nate) Bradley

Nathaniel (Nate) Bradley, CEO and Co-founder of Datavault Holdings, a ***highly accomplished inventor with over 70 international and U.S. patents*** across diverse fields such as Internet broadcasting, mobile advertising, behavioral healthcare, blockchain, cybersecurity, AI, and data science. As CEO and co-founder of Data Vault Holdings Inc., which operates Datavault Inc., Adio LLC, True Luck Inc., and Data Donate Technologies, Bradley ***has developed patented technologies that establish Datavault as a leader in Web 3.0 data monetization***. He has also lobbied Congress for a Digital Bill of Rights and founded the Intellectual Property Network Inc., offering IP and IT development services globally. Previously, Bradley was the inventor and founder of AudioEye (NASDAQ: AEYE), where he ***pioneered cloud-based assistive technologies, earning recognition for his contributions*** to internet accessibility. His ***extensive experience*** includes roles as chief technology officer for Marathon Patent Group (currently named Marathon Digital Holdings, NASDAQ: MARA) and involvement in significant acquisitions within the Internet Radio industry.

*   *   *

About Data Vault Holdings Inc.

Data Vault Holdings Inc. is a technology holding company that ***provides a proprietary, cloud-based platform for the delivery of branded data-backed blockchain objects. Datavault®, the company's patented platform, provides businesses with the tools to monetize data assets securely over its Information Data Exchange® (IDE)***. . .

43. Also in the 9/4/24 Release, Moyer stated the following concerning the acquisition and addition of Bradley:

> "This exciting ***transaction leverages our public company structure, creating a larger, more dynamic entity with broad reach in multiple, rapidly growing markets***," said Brett Moyer, CEO of WiSA Technologies. "***Datavault's substantial IP portfolio significantly amplifies our spatial audio technology and adds powerful HPC assets***. Further, Nate ***Bradley brings his exceptional track record of successfully commercializing IP for five companies over 30 years*** and that the Company I look forward to joining forces to work together and ***create shareholder value*** for WiSA investors."

44. Bradley too boasted about his credentials and his impact on the Company in the 9/4/24 Release, stating:

> Nathaniel T. Bradley, CEO and co-founder of Data Vault Holdings, said, "***I have repeatedly monetized patent portfolios via licensing models***. Now, our Data and Acoustic Sciences are ***ready for commercial expansion***. Already, our applications, including secure tokenization, data ownership and digital twin, have ***attracted reputable users, and our increased industry awareness positions*** us to expand our customer base."

45. On November 15, 2024, the Company hosted a conference call with Wall Street analysts and investors to discuss its financial results for the quarter ended September 30, 2024 ("11/15/24 Earnings Call") during which Bradley again boasted about his credentials, stating:

> My background for those that don't know me is centered around invention. I have ***successfully taken products from invention to commercialization and into the public markets***. Over my life span, I've had various timings that I have figured out with respect to this. ***You get better in life or at least you intend to, and this current opportunity follows really a career that is highlighted by our solution of the Internet for people with disabilities*** at Audioeye, my previous company, ticker AEYE, NASDAQ-traded company. We solve for making mobile and Internet sites accessible for those with disabilities.

46. Also during the 11/15/24 Earnings Call, Bradley stated the following concerning monetization and the Datavault Platform's value to the Company:

> Datavault, the high science, the ability to use the holograms of HYPERVSN that we are with the DVHolo brand, ***bringing a pay-per-view gateway experiential layer around the use of holograms and high science***. So, that's using scientific data that we proved and showed at an exhibit at the Digital Twin Institute that we were able to show a plant being grown off of the data into it. So, you see a sun cycle into a seed. . . . Datavault is focused on an exchange. ***We have the ability with our information data exchange to simplify all of that business into an exchange. We***

> ***sell data on behalf of our clientele in a safe and secure environment*** that's never existed before on our information data exchange. So, [that is] the focal point[], . . . the information data exchange . . . .

47. Responding to a question concerning the monetization of the Datavault Platform, Bradley stated:

> ***[P]artnerships on the buy and sell side.*** So, you will see a number of clients sign into the platform. We're at the commercialization stage of Data Vault. ***It's the flagship property of WiSA-Data Vault . . . [T]he monetization, to answer your question, on the information data exchange, you could expect a 70-30 split, 30% of the yield of a trade, think of it as 15% buy-side, 15% sell-side interest in that data set comes back to our company***. So, a 70-30 split, 30% coming to Data Vault, 70% in the pocket of our client, where we've taken, like Bloomberg does, a terminal, and we have a virtual meta terminal that we turn up for our clients called Datavault. [a]nd ***what we add for our clients to their data sets is a meta layer that adds value. So, we value and score*** . . .

48. On November 26, 2024, the Company filed with the SEC on Form 14A its 2024 Proxy Statement ("2024 Proxy"), which stated the following concerning executive compensation:

> ***Our compensation policies and procedures are centered on a pay-for-performance philosophy, and we believe that they are strongly aligned with the long-term interests of our stockholders***. Our compensation program is designed to attract, motivate, and retain the key executives who drive our success. ***Compensation that rewards excellence and reflects performance, and alignment of that compensation with the interests of long-term stockholders, are key principles of our compensation program design***. Although we have made and will continue to make improvements to our compensation program from time to time, these key principles have been unchanged for many years.
>
> We support the principle that ***our corporate governance policies, including our executive compensation program, should be responsive to stockholder concerns***. This principle is embodied in a non-binding, advisory vote that gives you as a stockholder the opportunity to approve the compensation of our named executive officers as disclosed in this proxy statement, including, among other things, our executive compensation objectives, policies and procedures. This vote is intended to provide an overall assessment of our executive compensation program rather than to focus on any specific item of compensation. ***We value the opinions of our stockholders and intend to take the outcome of this vote into account when considering future executive compensation arrangements***. However, because the vote is advisory, it will not directly affect any existing compensation awards of any of our executive officers, including our named executive officers.

> As discussed above, our ***executive compensation program is designed***:
>
> - ***to demand and reward excellence from each of our executive officers and from the management team as a whole***;
> - to align our interests with the interests of executives and other employees through compensation programs that ***recognize individual contributions toward the achievement of corporate goals and objectives without encouraging unnecessary or unreasonable risks***;
> - ***to further link executive and stockholder interests through equity-based compensation and long-term stock ownership arrangements***;
> - to ***recognize and reward excellence in an executive's performance*** in the furtherance of our goals and objectives without undertaking unnecessary or excessive risk; and ***to attract and retain high caliber executive and employee talent***.
>
> We encourage you to consider the detailed information provided in the Summary Compensation Table and the tables and other information that follow it. ***The Board will review the advisory voting results and will take them into account in making future executive compensation decisions***.

49. The 2024 Proxy represented the following concerning the Company's Long Term Incentive Plan, or LTIP:

> On January 30, 2018, the Board approved the establishment of the LTIP. The LTIP is intended to enable the Company to continue ***to attract able directors, employees, and consultants and to provide a means whereby those individuals upon whom the responsibilities rest for successful administration and management of the Company***, and whose present and potential contributions are of importance, can ***acquire and maintain Common Stock ownership, thereby strengthening their concern for the Company's welfare***. . .

50. On January 7, 2025, the Company issued a press release titled "WiSA Technologies Closes Purchase of Data Vault Holdings' Assets and Names Nate Bradley CEO" ("1/7/25 Release"), which set forth additional details concerning WiSA's acquisition of DVH and the forthcoming changes to the corporate name and within management. Commenting, Bradley stated the following in the 1/7/25 Release:

> Successfully integrating Datavault and WiSA creates a much larger and more robust company with ***significant synergies***. As a public company, we are ***positioned to grow by acquiring complementary niche technologies, to raise our***

> ***investment profile and to further leverage our core technologies. The strategic opportunities are abundant***, and I am thrilled to be leading our transformation."

51. Also in the 1/5/25 Release, Moyer doubled-down on his endorsement of the acquisition and of Bradley as CEO, stating:

> Nate is a technology visionary with the ***experience of successfully launching multiple publicly traded companies***. I resoundingly welcome him as incoming CEO and director to ***create value for our shareholders***. Datavault has been advancing its technology and strategic relationships since its founding six years ago, building value in the process. ***Now, we have a more diversified portfolio of assets and broad reach into multiple markets that are expected to exceed $4 billion in annual sales. Our offerings are gaining traction and now we can accelerate our growth plan***.

52. On February 13, 2025, the Company issued a press release titled "WiSA Technologies is Now Datavault AI Inc." ("2/13/25 Release") which, in addition to announcing the formal adoption of the name "Datavault AI Inc.," contained the following statement by Bradley:

> Completing our rebranding as Datavault AI, we've aligned the company with our core focus and broad reach into multiple, rapidly growing markets. We have integrated our assets, organized under our Data Science and Acoustic Science divisions. Now, ***we are well-positioned to realize partnering opportunities and grow the business across multiple vertical markets in 2025 and beyond***.

53. The 2/13/25 Release also stated the following concerning Datavault's ability to monetize assets and its technologic capabilities:

> Datavault AI is a data technology and licensing company that ***enables clients and strategic partners to monetize their Blockchain Data and AI Web 3.0 assets*** via tokenization, data ownership and digital twins . . .
>
> * * *
>
> Datavault AI, (Nasdaq: WISA) is ***leading the way in visualization, valuation, and monetization of assets in the Web 3.0 environment. Leveraging data sciences and acoustic sciences, the cloud-based platform provides comprehensive solutions serving multiple industries***, including HPC software licensing for sports & entertainment, events & venues, biotech, education, fintech, real estate, healthcare, energy and more. . .

54. On March 31, 2025, Datavault filed with the SEC on Form 10-K its annual report for the fiscal year ended December 31, 2024 ("2024 Annual Report"). The 2024 Annual Report, signed by Moyer, Bradley, Briskey, Gilbert, Howitt, Kristensen, Peruvemba, Tobias, Williams and Wilson, stated the following with regard to the Company's internal controls over financial reporting:

> ***Management conducted an evaluation of the effectiveness of Company's internal control over financial reporting*** based on criteria established in the 2013 Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, ***management concluded that Company's internal control over financial reporting was effective as of December 31, 2024***. . .

Appended as exhibits to the 2024 Annual Report were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), through which Moyer and Bradley certified, among other things, that the 2024 Annual Report did not contain "any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this [2024 Annual Report], fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report..."

55. The 2024 Annual Report SOX Certifications further stated that Moyer and Bradley:

> are ***responsible for establishing and maintaining disclosure controls and procedures*** (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13-a13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > a) Designed such disclosure controls and procedures or caused such disclosure controls and procedures to be designed under our supervision, to ensure that ***material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities***, particularly during the period in which this report is being prepared;

> b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to ***provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes*** in accordance with generally accepted accounting principles;
>
> c) Evaluated the effectiveness of the registrant's disclosure controls and procedures; and ***presented in this report our conclusions about the effectiveness of the disclosure controls and procedures*** as of the end of the period covered by this report based on such evaluation; and
>
> d) Disclosed in this ***report any change in the registrant's internal control over financial reporting*** that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting . . .

56. On May 20, 2025, Datavault hosted a Business Update Conference Call ("5/20/25 Conf. Call"), during which Bradley again boasted about the Company's Datavault Platform, monetization abilities and overall status, stating:

> Our business model, as you know, is a licensing company. At the center of our strategy is really this agent platform, the Datavault, which ***allows you to experience data, view data, see data from all of its sources, taking in data in a Web 3.0 format***, where all Web 2.0 formats, such as video and telecom and things that were not traditional data sources, are able to be seen, viewed and experienced within the Datavault.
>
> * * *
>
> ***Sumerian, this can't be overstated. We have with Sumerian crypto anchors, we have an industry-first durable, secure, micro, even Nano marking capability***, the ability to go down to the molecular level and mark everything from material or textile or piece of clothing or piece of products. We're able to mark physical metals. We can mark individual plastics and other substrates using these molecular markers. ***We also have perfected a microchip, a micro transponder that allows us to mark everything in an inventory platform***. We can mark inside human tissue. We've proven the ability to insert this into glass, into plastic. It survives the heat of molten metal. It can be adhered to bullets, adhered to casings. ***There's many use cases that we've perfected over the last quarter, where we have done bench testing and extreme testing around these marking technologies, and we're extremely excited about the enterprise level that we've reached to monetize these technologies within the Datavault***.

57. On July 22, 2025, the Company issued a press release titled "Global Defense Contractor Burke Products Selects Datavault AI for Enhanced National Defense and Aerospace Technologies Contracts" ("7/22/25 Release"), which touted forthcoming revenue from Datavault's partnership with Burke. Specifically:

> ***The partnership stands to deliver 2025 Revenues from existing contracts of Burke's that have now been subcontracted to Datavault AI and is set to scale into productized offerings into 2026. . . . Within the partnership Datavault AI has been contracted by Burke Products to engineer and produce solutions responsive to an array of opportunities***. All opportunities are managed under the contract in a case by case fashion designed to be responsive to private and public RFPs and requests made directly and through subcontracts obtained by Burke and other contracting mechanisms in place at Burke Products on a global basis.

58. Also in the 7/22/25 Release, Datavault claimed that the U.S. national defense budget for 2025 would exceed $900 billion (it did not) and that the Company was uniquely positioned, in light of its Burke partnership, to capitalize on the vast spending in the coming months, stating:

> [G]lobal defense spending is projected to exceed $2.2 trillion in 2025, with ***the U.S. defense budget alone expected to surpass $900 billion. As modernization efforts escalate, the sector is increasingly focused on secure data solutions, advanced tracking, and predictive intelligence areas where Datavault AI is uniquely positioned to deliver for Burke new and innovative solutions*** that solve for advantages and forward progression of technologies in this sector. With Web 3.0 centric contributions of Datavault AI this partnership will explore technological synergies with particular emphasis on secure data management, resource tracking, and communication systems critical to mission success.

59. Bradley also touted the Burke partnership and its lasting benefits to Datavault in the 7/22/25 Release, stating:

> ***This collaboration marks an international milestone of a scale we couldn't have anticipated when we first founded the company***. Sonia Choi has been diligently building toward this moment for years, and her ability to identify ***high-impact applications for Datavault AI's technologies*** while guiding our team through the execution with focus and discipline has been exceptional. Through her vision and leadership, ***we've reached a breakthrough that aligns seamlessly across our***

> ***VerifyU, ADIO®, High Performance Computing, WiSA and Datavault platforms, in concert with Burke Products' expansive capabilities, trusted network, and precision-driven engineering excellence*** . . . Together, with Burke Products, ***we now have an industry leading, solutions-oriented contracting partner that not only understands Datavault AI's mission, but is equipped to deliver defense-grade, purpose-built innovations when they are most needed***. Sonia's and Aaron [Bakshi, CEO of Burke] s influence will have a lasting impact not only on Datavault AI s trajectory, but on the broader U.S. defense industry it serves.

60. On August 22, 2025, the Company hosted a conference call with analysts and investors to discuss its financial results for the quarter ended June 30, 2025, during which Bradley touted Datavault's monetization capabilities as follows:

> If you look at the excitement around WiSA, it's about our ability to capture clientele in scale. And if you look at some of the ***advancements made with Datavault and the team, the ability for Burke Products to name us and select us into a government contracting opportunities*** around key instruments of both our military complex and administrative aspects of our government, ***we have also made a growth outlook in our patent licensing strategy and our ability to monetize inventions that we own in the United States***.

61. On September 25, 2025, Datavault issued a press release titled "Datavault AI Secures $150 Million Strategic Investment from Scilex Holding Company to Build Supercomputer and Launch Independent Data Exchanges in the US" touting its partnership with Scilex. Specifically:

> Datavault AI Inc. (Nasdaq: DVLT), a leader in AI-driven data visualization, valuation, and monetization, today announced the execution of a securities purchase agreement for a ***$150 million strategic investment from Scilex Holding Company*** (Nasdaq: SCLX). As described below, the investment will be made in two tranches, with an initial tranche of $8,067,000, expected to close on September 26, 2025, and a second tranche of $141,933,000 expected to close following receipt of stockholder approval as described below. The transaction, executed in Bitcoin (BTC) at the spot exchange rate published by Coinbase.com, is expected to ***strengthen Datavault AI's balance sheet and provide growth capital to accelerate its supercomputing infrastructure, expand independent data exchanges, and unlock new revenue streams***.

62. On October 23, 2025, Datavault issued a press release titled "Datavault AI Announces Headquarters Relocation to Philadelphia, Expansion of AI and Quantum Centers, and Advisory Board Growth to Fuel Rapid Innovation," in which the Company announced the opening of its research and development facility as follows:

> [T]he company has ***opened its Center for AI and Quantum Computing Excellence*** at 9040 Roswell Road in Sandy Springs, Georgia—***a state-of-the-art, Class A eight-story glass office building spanning 180,000 square feet on 23 wooded acres along the Chattahoochee River. Featuring modern high-speed infrastructure and on-site data centers, the lab is optimized for advanced computing with 22,000-square-foot floor plates ideal for collaborative R&D***. The center will align with Georgia Tech and the University of Georgia systems for talent recruitment, fostering breakthroughs in quantum computing and AI. Datavault AI is actively hiring AI engineers, blockchain specialists, and systems-integration experts to accelerate development.

63. On October 28, 2025, the Company issued a press release titled "Nature's Miracle Crowns Datavault AI with 35% Royalty License with Multi-Million-Dollar Global Technology License" touting its new licensing partnership with Nature's Miracle under which Datavault would receive a non-refundable $2 million license fee and a 35% royalty on all gross revenue generated through the licensed technology going forward ("10/28/25 Release"). Commenting on the transaction, Bradley stated in the 10/28/25 Release that:

> This agreement represents a ***significant milestone in Datavault AI's ongoing strategy to commercialize our patent portfolio across high-growth industries like sustainability and carbon markets*** . . . By licensing our carbon credit tokenization system to Nature's Miracle, we are aligning with a partner whose expertise in innovative, sustainable environmental technology is being applied to ***accelerate the adoption of blockchain for verified carbon markets***.

64. The statements referenced above were materially false and misleading when made in that they: (a) overstated the economic value of the Company's highly touted acquisitions and corporate partnerships; (b) exaggerated the volume of trading activity on Company platforms; (c) concealed Datavault's fundamental affiliations with individuals known to defraud investors; and

(d) misrepresented the strength of the Company's internal controls and alignment of the Company's executive compensation with shareholder value.

### *D. The Truth is Revealed to Investors*

65. On October 31, 2025, the Wolfpack Report revealed the falsity of the above-referenced statements as follows:

- We are short Datavault Al Inc. (DVLT), a reverse merger which has risen ~800% since early September, because we believe ***it is a stock promotion that relies on misleading press releases and empty claims*** that it is "leading the way in Al driven data experiences, valuation and monetization of assets in the Web 3.0 environment." We think ***DVLT makes numerous demonstrably false and absurd claims***, but what really makes DVLT special in our opinion is that the ***promotion is coming from an amazing cast of characters that we would describe as top-tier bullshitters including a convicted felon***.

- It takes almost no effort to discover that ***DYLT's "blockchain" powered platform, Data Vault, is a joke***. We signed up and found that much of the "data" for sale are NFTs, like photos of Dr. Oz, Vladmir Putin vomiting, and a Dean's List token for a community college. Trading activity on the platform appears to be minimal, if not non-existent. The last known data for sale on the exchange appears to have been uploaded by DVLT employees attempting to sell widely available historical weather data.

- ***DVLT's announcement on October 2Y[d] that it had opened its Center for Al and Quantum Computing Excellence in Sandy Springs, Georgia appears to be total bullshit***. DVLT claimed the location has "on-site data centers", and a lab "optimized for advanced computing with 22,000-square-footjloor plates idea/for collaborative R&D." It sounds to us like they own or lease the whole building, or at least several floors-but they don't. During our site visit, we found they have a ~2,800 square foot office tucked away on the fifth floor of a generic office building in suburban Atlanta. We only saw one-person working on site. ***When we asked an employee of the building if there were on-site data centers as DVLT claims, they looked at us like we were crazy and said no such thing exists***. If they can figure out how to squeeze 22,000-square-foot floor plates into that office-then mastering the quantum computing, AI, blockchain, Web3, Machine Learning buzzword bonanza should be no problem.

- The ***SEC charged DVLT co-founder and CEO, Nathaniel Bradley in July 2021*** for falsely claiming that his company Parallax Health Sciences would have a Covid-19 test "available soon" and personal protective equipment available for "immediate sale" when ***in truth, the company was insolvent and could not possibly deliver what it told shareholders***. ***Bradley settled and paid a $40,000 fine and was***

***banned from participating in any penny-stock offering for three years***. Unsurprisingly, Bradley omits his role as Chief Technology Officer of Parallax Health Sciences from his company biography featured on DVLT"s website (though it is disclosed in company filings).

- ***Bradley and his spouse, Sonia Choi, co-founded Datavault*** per their company bios and respectively hold the roles of CEO & CMO at DVLT. Per SEC filings, ***the pair appear to split their time operating the business out of a hair salon in New Jersey and a co-working space in New York City***.

- ***Convicted felon Edward Withrow III is listed as an inventor alongside Bradley*** on multiple patents owned by EOS Technology Holdings Inc., a related party and entity ran by Bradley which appears to be ***one of DVLT's largest shareholders.*** Withrow is a ***convicted felon who pled guilty to making false statements after being charged with participating in a pump and dump scheme*** that went on from 2012-2013 when he owned and controlled Parallax Diagnostics, Inc (which eventually became Parallax Health Sciences where Bradley worked). He was sentenced to 5 months house arrest and five years of probation.

- Speaking of dubious relationships, DVLT just announced a partnership with James Li's Nahire's ***Miracle Holding (NMHI) where NMHI promised a non-refundable $2 million fee and a 35% royalty to DVLT*** when it sells its Carbon Credit Tokenization System. Where is NMHI going to get this money? As we discussed in our report on Faraday Future Intelligent Electric (FFAI), ***NMHJ has just $9,551 in cash to NMID's James Li already promised to buy $100 million of FFAI's cars*** from his old classmate Jia Yuting! Apparently, if you are looking to put out a press release with a penny stock that has no money, Nature's Miracle's CEO James Li is your guy.

- ***DVLT announced a partnership with Burke Products, a "Global Defense Contractor" in July 2025***, and announced in August 2025 that "Datavault Al will mint experiential Valor tokens via a proprietary, military-grade deployment co-developed with Burke." ***However Burke describes itself as a "Small Disadvantaged Business" in Ohio which has been awarded just $3.1 million in contracts in 2025, mainly for components such as coils, piping, bolts, and nuts***. DVLT's PR tries to insinuate that Burke is using DVLT's Al tech for a contract awarded by the government, but we reviewed the contracts given to Burke Products and we can find not one mention of AI.

- ***On September 25th, 2025, DVLT announced it had secured a $150 million strategic investment from Scilex Holdings*** (NASDAQ: SCLX) to "build a supercomputer and launch independent data exchanges." ***However, SCLX's market cap is less than $150 million and it had just $4. l million in cash and cash equivalents at the end of Q2 2025***. DVLT claims SCLX will receive the BTC by selling stock in an illiquid, over the counter company to Biconomy PTE.LTD; our search of open corporates and Singaporean filings indicates this entity does not

exist. ***If there is a real (misnamed) entity behind this deal and it goes through, SCLX will receive over 260 million shares at $0.5378 per share and causing 48% dilution***.

- ***DVLT pays for stock promotion. It paid $14,000 for a positive article from barchart*** published earlier this week. It has ***paid Investor Brand Network $180,000 for a year's worth of positive coverage***. It has apparently ***paid, Momentum Media LLC, aka Market Tips Newsletter, $80,500 to date***. We think retail has been subject to astroturfing on this name and that it will end in nothing but tears.

- ***Datavault intellectual property and other assets were purchased for $210 million in 2024 from EOS Technology Holdings Inc. (now one of DVLT's largest shareholders and an entity ran by Bradley) by WiSA Technologies*** (NASDAQ: WISA) in a deal consisting of $200 million of stock and a $10 million note. WISA saw its share price decline 99.99% during its tenure as a publicly traded company before it announced the "acquisition" of Datavault. ***We think this deal was essentially a reverse merger, and in keeping that, Bradley was appointed CEO of WISA in December 2024 when the deal closed and then the company was renamed Datavault AI*** (DVLT)

* * *

**Conclusion: It's a Joke**

***We really only have scratched the surface*** on this name. We would dive in and go on and on detailing every dubious thing we could find, but why bother? If you don't get the gist of what is going on here, you never will. ***We think DVLT is a total joke***.

66. When this news reached the market, the price of Datavault common stock immediately dropped nearly 20%, or $.49 per share, from $2.52 at close on October 30 to $2.03 at close on October 31, 2025.

67. Moreover, the Wolfgang Report also served to reveal the truth about Datavault's management team, particularly the Individual Defendants. Investors learned that the Company's representations concerning internal controls were false and, relatedly, that its statements concerning Individual Defendants' competence and compensation programs—*i.e.* that both were designed to benefit shareholders—were patently false. To the contrary, the Individual Defendants used the Company as its patsy to fraudulently enrich themselves with, Bradley, Moyer and

Mbugua making nearly $74 million from stock sales alone, despite allowing—if not causing—Datavault to collapse.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

68. Plaintiff brings this action derivatively in the right and for the benefit of Datavault to redress Individual Defendants' breaches of fiduciary duty and other violations of law.

69. Plaintiff will adequately and fairly represent the interests of Datavault and its shareholders in enforcing and prosecuting its rights.

70. The Board currently consists of the following nine directors: Defendants Moyer, Bradley, Briskey, Gilbert, Howitt, Kristensen, Peruvemba, Tobias and Wilson.

71. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons.

72. The Individual Defendants face a substantial likelihood of liability for, among other things, approving or otherwise not preventing Datavault's issuance of its financial and related statements that, among other things, failed to disclose that the Company (a) overstated the economic value of the Company's highly touted acquisitions and corporate partnerships; (b) exaggerated the volume of trading activity on Company platforms; (c) concealed Datavault's fundamental affiliations with individuals known to defraud investors; and (d) misrepresented the strength of the Company's internal controls and alignment of the Company's executive compensation with shareholder value.

73. During various times of the Relevant Period, pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were and are responsible for, among other things, reviewing the Company's annual and quarterly financial reports and reviewing the integrity of the Company's internal controls. The Audit Committee Defendants breached their fiduciary

duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures and failed to recognize or correct Datavault's internal control failures. Therefore, the Audit Committee Defendants each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

74. Moreover, the Audit Committee Defendants failed to maintain the level of oversight required, including that the requirements that the Audit Committee discuss with management and review with the Board, the legal and regulatory requirements applicable to the Company and its subsidiaries and the Company's compliance with such requirements and as appropriate, make recommendations to the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations.

75. Also during various times of the Relevant Period, pursuant to the Company's Compensation Committee Charter, the Compensation Committee Defendants were and are responsible for, among other things, determining and recommending to the Board executive and Board compensation policies, plans and programs and to review and discuss with management disclosures regarding same. The Compensation Committee Defendants breached their fiduciary duties of due care, loyalty, and good faith, because the Compensation Committee, among other things, allowed and/or caused the Company to pay exorbitant compensation to the Individual Defendants despite their failure to meet their respective responsibilities and duties and because the policies that allowed such payments were woefully deficient and not aligned with creating shareholder value. Therefore, the Compensation Committee Defendants each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

76. Similarly, during various times of the Relevant Period, pursuant to the Company's NCG Committee Charter, the NCG Committee Defendants were and are responsible for, among other things, overseeing aspects of the Company's corporate governance functions on behalf of the Board; making recommendations to the Board regarding corporate governance issues and identifying and evaluating candidates to serve as directors of the Company. The NCG Committee Defendants breached their fiduciary duties of due care, loyalty, and good faith, because the NCG Committee, *inter alia*, caused and/or allowed the Company to recommend, elect and retain directors who not only wholly failed in their duties to steward Datavault, as well as committed and/or allowed Company directors and officers to engage in insider trading, self-dealing and other acts inconsistent with the best interests of Datavault. Therefore, the NCG Committee Defendants each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

77. The principal professional occupation of Bradley is his employment with Datavault, pursuant to which he has received, and continues to receive, substantial monetary compensation and other benefits.

78. The acquisition that essentially shaped the current iteration of the Company and, at bottom, is the transaction at the core of the improper conduct described herein, was in reality a reverse merger that enriched Bradley's closely-held company EOS by $210 million and served to install Bradley as Datavault's CEO.

79. In conjunction with the issuance of false statements as set forth herein, Bradley, Moyer and Mbugua enriched themselves by selling a combined 36,210,056 shares of Datavault common stock for nearly $74 million while in possession of material, adverse, non-public information. Specifically, Bradley sold 36,034,342 shares of Company common stock, totaling

$73.8 million; Moyer sold 139,527 shares totaling $67,738; and Mbugua sold 36,187 for $17,625 as follows:

| DATE | SELLER | QUANTY | PRICE ($) | PROCEEDS ($) |
|---|---|---|---|---|
| 9/23/24 | Moyer | 2,220 | 1.67 | 3,707.40 |
| 12/23/24 | Moyer | 6,553 | 1.79 | 11,729.87 |
| 12/23/24 | Mbugua | 2,267 | 1.79 | 4,057.93 |
| 12/31/24 | Bradley | 36,000,089 | 2.05 | 73,800,182 |
| 8/28/25 | Bradley | 34,253 | 0.40 | 13,701.20 |
| 8/28/25 | Mbugua | 33,920 | 0.40 | 13,568.00 |
| 8/28/25 | Moyer | 130,754 | 0.40 | 52,301.60 |

**COUNT I**

**Against Individual Defendants for Breach of Fiduciary Duties**

80. Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein.

81. As alleged in detail herein, each of the Individual Defendants violated and breached their fiduciary duties of loyalty and good faith by causing or allowing the Company to disseminate to Datavault shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings, press releases, conference calls and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

82. Also as alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

83. Individual Defendants, most notably those serving on the Board's Audit Committee, willfully ignored the known and pervasive problems with Datavault's internal controls

and practices and procedures and failed to make a good faith effort to correct these problems or prevent their recurrence.

84. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages. Thus, as a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**COUNT II**

**Against Individual Defendants for Unjust Enrichment**

85. Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein.

86. By their wrongful acts and omissions, Individual Defendants were unjustly enriched at the expense of and to the detriment of Datavault.

87. Plaintiff, as a shareholder and representative of Datavault, seeks restitution from Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Individual Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

**PRAYER FOR RELIEF**

88. WHEREFORE, Plaintiff demands judgment as follows:

a. Declaring that Plaintiff may maintain this derivative action on behalf of Datavault and that Plaintiff is a proper and adequate representative of the Company;

b. Against Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Individual Defendants' breaches of fiduciary duties;

c. Directing Datavault to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable law and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's by-laws or articles of incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

d. Awarding to Datavault restitution from Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Individual Defendants;

e. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

f. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

89. Plaintiff demands a trial by jury.

Dated September 17, 2026

Respectfully submitted,

**THE WEISER LAW FIRM, P.C.**

*s/ James M. Ficaro*

JAMES M. FICARO (PA Bar No. 308198)
jficaro@weiserlawfirm.com
JOHN J. GROSS (PA Bar No. 91687)
jgross@weiserlawfirm.com
Four Tower Bridge

200 Barr Harbor Drive, Suite 400
West Conshohocken, PA 19428
Telephone: (610) 225-2677

**DATAVAULT AI, INC. VERIFICATION**

I, Jordan Wilson, hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Complaint, and that I have authorized the filing of the Verified Shareholder Derivative Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 09/15/26

Jordan Wilson
Jordan Wilson (Sep 15, 2026 09:13:16 EDT)

Jordan Wilson